UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| HESHAM K. ALOMARI and | ) | Bankruptcy No. 10 B 47008 |
| NADIA H. ALOMARI, | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| ERICA CHRISWELL, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 10 A 02312 |
| | ) | |
| HESHAM K. ALOMARI and | ) | |
| NADIA H. ALOMARI, | ) | |
| Defendants. | ) | |
| | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Debtors Hesham and Nadia Alomari ("Defendant" and "Defendant's Wife" respectively) filed their joint petition for relief under chapter 7 of the Bankruptcy Code. Plaintiff Erica Chriswell instituted the above-entitled Adversary Proceeding seeking determination of non-dischargeability of debt against both debtors under 11 U.S.C. §§ 523(a)(2)(A) and (a)(4). This matter was tried on Plaintiff's Fourth Amended Complaint (10 A 02312, Dkt. No. 28, hereinafter the "Complaint"). Plaintiff represented herself at trial.

Plaintiff's exhibits 1 through 11, 13 through 16, 18, and 20 were admitted into evidence.[1] At trial, Plaintiff, appearing *pro se*, called two witnesses: Hesham Alomari, one of the defendants herein, and Plaintiff herself. After presentation of Plaintiff's case, Defendants' motion for a

---

[1] Plaintiff's exhibit 9 is a transcript of Hesham Alomari's deposition taken on August 31, 2012. Plaintiff highlighted those specific portions of the transcript that she wished to introduce into evidence. The Court then heard argument and ruled separately on the admissibility of each highlighted portion.

directed verdict was allowed from the bench only in favor Nadia Alomari on both counts of the Complaint, and judgment in her favor is today separately entered. Trial proceedings continued against the remaining defendant, Hesham Alomari. Defendant's counsel called no witnesses and introduced no additional exhibits into evidence. Both sides rested after presentation of evidence and argument. Based thereon, the following Findings of Fact and Conclusions of Law are made and entered pursuant to which judgment will be separately entered in favor of Defendant on Count I and in favor of Plaintiff on Count II.

## FINDINGS OF FACT

1. Debtor-defendants Hesham Alomari and Nadia Alomari are a married couple residing at 15411 Stradford Lane in Orland Park, Illinois.

2. Since 1988, Defendant Hesham Alomari owned and operated Jenin Food Plaza, a grocery store in Chicago, Illinois, until the business was sold in 2008.

3. Plaintiff Erica Chriswell first met Defendant in 2000 while patronizing Defendant's business.

4. In May 2006, Defendant purchased certain residential property located at 8046 Narrgansett Avenue in Burbank, Illinois. Title to the property was conveyed to Defendant alone. Thereafter, Defendant had the existing structure demolished and hired a contractor to begin construction of a new single family residence (the "Narragansett Property").

5. In order to finance construction of the Narragansett Property, Defendant applied for and obtained a construction loan from National City Bank.

6. Under the terms of the construction loan agreement, Defendant could not draw funds under the construction loan without his contractor's involvement. Moreover, the loan

agreement required that the construction be completed by a certain deadline, after which Defendant would have to begin repaying amounts disbursed under the loan.

7. Before construction of the Narragansett Property was completed, Defendant's contractor abandoned the project.

8. After the contractor abandoned the project, Defendant was unable to draw any of the approximately $25,000 remaining in the construction loan to finish the Narragansett Property.

9. The deadline to finish construction under the construction loan agreement passed, and Defendant was required to begin repaying the amounts disbursed under the construction loan. Defendant defaulted on making such payments in March 2007, and he then had no assets to enable him to complete construction.

10. At a meeting in 2007, Defendant learned from Plaintiff that she was trying to purchase a house but that she was having difficulty obtaining a loan. Defendant advised Plaintiff that he was building a new house and invited Plaintiff to see the Narragansett Property.

11. Plaintiff viewed the Narragansett Property sometime in October 2007 and expressed interest in it. At this time, the Narragansett Property was still not complete. Appliances had not yet been installed, the bathrooms and kitchen needed additional work, and the property was not landscaped.

12. Shortly thereafter, the parties had a telephone conversation where Defendant offered to enter into a rental agreement with Plaintiff that included an option to buy the Narragansett Property. Defendant had his attorney draft the proposed agreement (the "Lease Contract"

or "Contract") and met with Plaintiff again sometime in late October 2007 to give her a copy to review.

13. The proposed Lease Contract included a provision requiring Plaintiff to pay a "security deposit" of $53,000 at the execution of the contract. Plaintiff discussed the terms of the Lease Contract with her father. She also had the Lease Contract reviewed by her attorney with whom she consulted.

14. Thereafter, Plaintiff met with Defendant at a restaurant where she expressed various concerns about the Lease Contract and Defendant's financial condition. Defendant assured Plaintiff of his financial stability and that he was not at risk of going bankrupt.

15. At this meeting, Defendant also told Plaintiff that he would not spend her security deposit and that she would receive copies of his bank statements to show her that he was making payments on the mortgage loan.

16. On November 12, 2007, Plaintiff met with Defendant and Defendant's attorney at that attorney's office, and both parties signed the Lease Contract as originally drafted. Plaintiff gave Defendant a total of $53,000 in cashier's checks and cash as the "security deposit" required by section three of the Lease Contract (the "Security Deposit"). That money came half as hers and half loaned to her by her father to enable her to make this investment.

17. The Lease Contract stated that the Contract document was the entire agreement between the parties concerning the Narragansett Property and that the Contract could only be amended in writing.

18. The Lease Contract also contained a stipulation that neither party was relying on any prior inducements, representations, promises or agreements, oral or otherwise.

19. The Lease Contract required Plaintiff to make monthly rent payments of $1,500 during the lease term from January 2008 through December 2010 (the "Lease Term").

20. The Lease Contract included an option for Plaintiff to purchase the Narragansett Property. Under its terms, if Plaintiff exercised her option at any time prior to the end of the Lease Term, the Security Deposit would be applied to the purchase price. But if Plaintiff did not exercise the option, Defendant would reimburse Plaintiff the Security Deposit after deducting up to $5,000 in repair costs necessitated by Plaintiff's tenancy.

21. The Lease Contract further provided that the agreement was to be interpreted, construed, and governed by Illinois law.

22. The Lease Contract was never amended in writing after it was signed.

23. The day after the Lease Contract was signed, Defendant deposited the Security Deposit funds into his personal bank account and soon began spending the money from Plaintiff and making large cash withdrawals therefrom; some of these expenditures and withdrawals related to Defendant's need for funds to complete construction on the Narragansett Property, and some were for unrelated personal expenses.

24. While Defendant testified that Plaintiff orally gave permission to spend the Security Deposit in order to complete construction, Plaintiff never orally or in writing permitted Defendant to spend any amount of the Security Deposit either before or after they entered into the Lease Contract. Defendant had no records or documents corroborating Plaintiff's purported consent. Defendant's testimony as to such consent by Plaintiff was false.

25. Defendant did not keep or introduce records accounting for how the Security Deposit moneys were spent.

26. Plaintiff moved into the Narragansett Property in January 2008 when the Lease Term began.

27. Defendant could not refinance the Narragansett Property so long as it remained under construction.

28. By the end of January 2008, Defendant had spent all but $13,000 of the Security Deposit, at least some of which was assertedly used to finish construction of the Narragansett Property.

29. On January 21, 2008, Defendant refinanced the Narragansett Property and obtained a loan for $477,000.00 from CitiMortgage, Inc. The funds were used to repay Defendant's prior obligations to National City Bank, including the balance due on the construction loan. Defendant also received $4,262.03 from the loan at the closing. CitiMortgage was granted a mortgage on the property in connection with this transaction.

30. After refinancing the Narragansett Property, Defendant used the unspent balance of Plaintiff's Security Deposit (approximately $13,000) to make monthly payments on the CitiMortgage loan beginning in March 2008.

31. Defendant at no time replaced the Security Deposit in any amount so designated.

32. In March 2008, Plaintiff received a copy of a bank statement from CitiMortgage showing that the first mortgage loan payment had been made. No further statements were sent to her; however, for several months thereafter Plaintiff called the bank directly to confirm Defendant's payments on the mortgage loan.

33. Defendant's last loan payment to CitiMortgage was in July 2008.

34. Plaintiff learned in October 2008 that Defendant had failed to make payments on the mortgage loan since July 2008. Plaintiff then called Defendant, who told her that he was planning to file for bankruptcy. Defendant suggested that Plaintiff stop paying rent in lieu of having the Security Deposit returned. Plaintiff stopped paying rent after this conversation, but she continued to insist on the return of her Security Deposit.

35. Plaintiff paid $1,500 every month in rent from January 2008 through October 2008 until she has the foregoing conversation with Defendant.

36. Plaintiff did not pay any rent to Defendant since November 2008.

37. In 2009, CitiMortgage sued to foreclose its mortgage on the Narragansett Property.

38. Plaintiff never exercised her option to buy the Narragansett Property. However, while foreclosure proceedings were ongoing, Plaintiff and Defendant met with a real estate professional and discussed arranging a short sale of the property, though no agreement was reached or steps taken for that to happen.

39. On October 7, 2010, Plaintiff filed a complaint in the Circuit Court of Cook County, Illinois, against Defendant for breach of contract and fraud (the "State Court Action").

40. On October 20, 2010, Defendant and Defendant's wife filed their joint petition for relief under chapter 7 of the Bankruptcy Code. The State Court Action was thereby stayed by the effect of the automatic bankruptcy stay.

41. On March 16, 2011, the State Court Action was dismissed for want of prosecution, though that order might be corrected as a result of this case.

42. Through the last day of trial in this Court, Plaintiff continued to reside in the Narragansett Property without paying rent. Defendant did not return any part of her Security Deposit.

43. Additional facts set forth in the Conclusions of Law will stand as additional Findings of Fact.

## JURISDICTION AND VENUE

Jurisdiction lies over this proceeding under 28 U.S.C. § 1334(b), and the proceeding has been referred here by Internal Operating Procedure 15(a) of the District Court. The Complaint seeks to determine dischargeability of debt and is therefore a core proceeding under 28 U.S.C. § 157(b)(2)(I). Venue is properly placed in this court under 28 U.S.C. § 1409(a).

## CONCLUSIONS OF LAW

### Standards Applicable to 11 U.S.C. § 523

The party seeking to establish an exception to the discharge of a debt bears the burden of proof. *Selfreliance Fed. Credit Union v. Harasymiw (In re Harsymiw)*, 895 F.2d 1170, 1172 (7th Cir. 1990). The United States Supreme Court has held that the burden of proof required to establish an exception to discharge is a preponderance of the evidence. *Grogan v. Garner, 498 U.S. 279, 291 (1992)*. To provide an "honest but unfortunate debtor" with a fresh start, courts will construe exceptions to discharge strictly against a creditor and liberally in favor of the debtor. *Id.* at 286-87.

### Count I: Objection to Dischargeability of Debt under 11 U.S.C. § 523(a)(2)(A)

Count I of the Complaint seeks determination of non-dischargeability of debt under section 523(a)(2)(A) of the Bankruptcy Code, which provides that a debtor shall not be discharged from any debt for money "to the extent obtained by false pretenses, a false

8

representation, or actual fraud, other than a statement respecting the debtor's . . . financial condition." 11 U.S.C. § 523(a)(2)(A).

A party seeking to except a debt from discharge under § 523(a)(2)(A) must establish each element of by preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286 (1991); *In re Martin*, 698 F.2d 883, 887 (7th Cir. 1983). To make out a claim for false representation, a creditor must establish that "(1) the debtor made a false representation of fact, a representation, (2) which the debtor (a) either knew was false or made with reckless disregard for the truth and (b) made with an intent to deceive, (3) upon which the creditor justifiably relied." *Ojeda v. Godberg*, 599 F.3d 712, 716 (7th Cir. 2010). To be actionable under § 523(a)(2)(A), "a false representation must concern present or past asserted facts and not be representations or promises to do future actions unless the debtor never intended to perform or had no reasonable basis for his promise of performance or other representation." *In re Grossman*, 174 B.R. 972, 984 (Bankr. N.D. Ill. 1994). Plaintiff argues that Defendant's representation in the Lease Contract that he would return her security deposit if she did not exercise her option to buy the Narragansett Property was a knowingly false statement. (Compl. ¶¶ 12, 15.) Plaintiff also claims that Defendant made knowingly false representations to her in the context of their negotiations prior to entering into the Lease Contract, specifically, that Defendant would keep her deposit "safe" and that his financial condition was "great." (Compl. ¶¶ 10, 13, 14.) Each ground for excepting a debt from discharge under § 523(a)(2)(A) must be separately considered. *Zamora v. Jacobs (In re Jacobs)*, 448 B.R. 453, 470 (Bankr. N.D. Ill. 2011).

Plaintiff's claims of false representation based on any oral statements made by Defendant as to his financial condition prior to the parties signing the Lease Contract must be rejected.

Statements concerning a debtor's financial condition do not form a basis for nondischargeability unless made in writing. *In re Amari*, 12 WL 5940287, *8 (Bankr. N.D. Ill. Nov. 27, 2012) (finding statements concerning a debtor's financial condition fall under the purview of § 523(a)(2)(B), which expressly requires that such statements be written). To the extent that such statements concerned Defendant's financial condition, they are expressly excluded by the statutory language of § 523(a)(2)(A). Plaintiff testified that she agreed to the Lease Contract because she believed Defendant to be a successful businessman in good financial standing. Even if Defendant allowed her to believe that without correction, that was not actionable under § 523(a)(2)(A) because no written financial statement was requested by her and given by him. The same goes for Defendant's representations that he was financially sound and not at risk of filing for bankruptcy.

Plaintiff's case therefore hinges on whether or not Defendant made an actionable false representation within the Lease Contract itself when he signed it. Section three of the Lease Contract provided in relevant part:

> Lessee [Plaintiff] shall pay a security deposit in the amount of $53,000.00 at the execution of the Agreement. Said security deposit shall be deducted from the purchase price at the time of closing in the event Lessee exercises her option to purchase. In the event Lessee does not exercise her right to purchase the premises, Lessor/Owner [Defendant] shall reimburse Lessee only the security deposit paid minus all sums used to repair damages to the premises caused by Lessee's use and occupancy. Said sum used for repairs and/or damages shall not exceed $5,000.

Plaintiff argues that the promises made by Defendant in this section constituted false representations because Defendant knew when he signed the document that he could not and would not return the Security Deposit if Plaintiff chose not to exercise her option to purchase the Narragansett Property. He had such knowledge and intent because he was planning to spend the

money to complete construction required before he could refinance the construction loan. Defendant's promise to reimburse the Security Deposit in the future, if false, could constitute a false representation under § 523(a)(2)(A) if it was made with the intent at the time not to perform. *See Citibank (S. Dakota), N.A. v. Michel*, 220 B.R. 603, 606 (N.D. Ill. 1998). Therefore, the key issue is whether Defendant intended, when he signed the Lease Contract, to spend and not to return and repay the Security Deposit to Plaintiff.

"A bankruptcy judge attempting to determine the applicability of § 523(a)(2)(A) must evaluate the subjective intent of the debtor: there is no fraud when a person makes a representation that he sincerely believes is true." *Id.* There is no bright-line standard to determine a debtor's subjective intent to repay a debt, and courts will typically look at the totality of the circumstances to determine whether the debtor's conduct was calculated to deceive or cheat a creditor. *In re Galarza*, 2012 WL 6055328, *3 (Bankr. N.D. Ill. Nov. 30, 2012).

Based on the evidence of record, Plaintiff has not shown that Defendant intended not to return the Security Deposit when he signed the Lease Contract. Defendant did not declare bankruptcy until October 2010, twenty-three months after the contract was signed. During this time the parties discussed the possibility of a short sale of the Narragansett Property. At one point, Defendant offered to borrow money from his family to return Plaintiff's deposit if she agreed to move out. (Ex. 9, p. 39.) Defendant spent at least part of the Security Deposit money to finish construction of the house and to make repairs after Plaintiff moved in.[2] Defendant also offered to forgo rent payments to which he was entitled, and he did not take action against

---

[2] To what extent Defendant used the Security Deposit money for other purposes is unclear since the funds were co-mingled with Defendant's personal funds and Defendant failed to keep records of how the money was spent.

11

Plaintiff, who did not pay monthly rent due on the Lease Contract for a total of twenty-six months of the rental period (from November 2008 to December 2010).[3] It is clear from the evidence that Defendant was undergoing financial difficulty when the contract was signed. He also had a motive to seek additional capital to finish the house since he could not draw on the construction loan to do so. Considering the totality of the circumstances, however, the Court finds that even though Defendant was planning to spend the Security Deposit, at the time he had a subjective intent to repay the money at the time he signed the Lease Contract and realistic sources from which to do so.

Defendant therefore had a reasonable basis to believe he could repay the Security Deposit in the future. Unlike a debtor who desperately gambles borrowed money in the hope of repaying creditors, it was not unreasonable for Defendant to believe that he could sell the Narragansett Property and recoup the Security Deposit before he would have to repay Plaintiff. His use of the Security Deposit was a part of his plan to finish construction so that he could refinance the house and hopefully sell the property. Moreover, despite Defendant's financial difficulties, Plaintiff's Exhibit 7 shows that Defendant received another $50,500 from unrelated sources in March 2008, after he had already spent most of Plaintiff's money. When the contract was signed, Plaintiff had agreed that the appraised value of the Narragansett Property was $530,000, and the evidence shows that Defendant had equity in excess of the Security Deposit when the Lease Contract was signed.[4] Therefore, because Defendant had some factual basis supporting his subjective intent to

---

[3] Plaintiff also continued to live in the house without paying rent after the expiration of the Lease Term at the end of December 2010 through the date of trial.

[4] Loans secured by the Narragansett Property totaled approximately $476,000. Defendant also had equity in his Orland Park home as well.

12

repay the Security Deposit at the time he signed the Lease Contract, his promise to do so was not shown by preponderance of evidence to have been a false representation under § 523(a)(2)(A).

### Count II: Objection to Dischargeability of Debt under 11 U.S.C. § 523(a)(4)

Count II of the Complaint seeks determination of non-dischargeability of debt under section 523(a)(4) of the Bankruptcy Code, which provides that a debtor shall not be discharged from any debt obtained by "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). Plaintiff's § 523(a)(4) claim alleges that Defendant held the Security Deposit in a fiduciary capacity, the Defendant embezzled the Security Deposit, and that the appropriation of the Security Deposit constituted a defalcation while acting as a fiduciary. The phrase "acting in a fiduciary capacity" qualifies the words "fraud or defalcation" but does not qualify the words "embezzlement" or "larceny." *Collier on Bankruptcy* ¶ 523.10[d]. Therefore, any debt resulting from embezzlement or larceny falls within the exception regardless of whether a fiduciary duty is owed. *Id.* As a result, Plaintiff may prevail if she has established either fraud or defalcation while acting in a fiduciary capacity or proved embezzlement of funds due to Plaintiff even if they were not held in a fiduciary capacity or trust.

A Memorandum Opinion was previously entered in this proceeding, pursuant to which Defendant's Motion to Strike and Dismiss Plaintiff's Second Amended Complaint (Dkt. No. 27) was denied. In that Motion, Defendant sought dismissal of the Complaint for failure to state a claim upon which relief could be granted,[5] arguing that the Complaint failed to set forth the elements of a legal or statutory basis for her claims. Plaintiff's Fourth Amended Complaint, filed

---

[5] The Motion actually proceeded under Fed. R. Civ. P. 12(h)(2) but was treated as a motion to dismiss for failure to state a claim upon which relief can be granted under Rules 12(b)(6) and (8) of the Fed. R. Civ. P.

after Defendant's Motion specified the Code provisions she relied on and the Motion was denied on that basis. Before that, however, the parties were ordered to submit supplemental briefs on the issue of whether the Security Deposit was held in trust and whether § 523(a)(4) applied to this proceeding.

That Opinion held the language in the Lease Contract did not by itself establish a trust in favor of Plaintiff with regard to the Security Deposit. *Chriswell v. Alomari (In re Alomari)*, Nos. 10 B 47008, 10 A 02312, 2011 Bankr. LEXIS 3187, at *9 (Bankr. N.D. Ill. Aug. 15, 2011). "An express or technical trust requires an explicit declaration of trust, a clearly defined trust res, and an intent to create a trust." *Smith v. Marcet (In re Marcet)*, 352 B.R. 462, 468 (Bankr. N.D. Ill. 2006.) The Opinion observed that:

> The Lease does not appear to create a trust in favor of Plaintiff. It is more like a lease establishing mutual debts described in *McGee*, in that the Plaintiff here had a duty to cover damages up to $5,000 and Defendants had a duty to repay the security deposit less the sum required to repair any damage to the premises. Unlike the applicable ordinance in *McGee*, the Lease here did not require that the security deposit . . . be treated as Plaintiff's property.

*Chriswell*, 2011 Bankr. LEXIS 3187, at *9.

The Opinion therefore ruled that Plaintiff had failed to state a claim for misappropriation of an express trust. *Id.* However, Plaintiff's § 523(a)(4) claim was not dismissed because at that time it was held that Plaintiff had alleged facts sufficient to demonstrate that a fiduciary relationship may have existed and that she could attempt to prove such relationship at trial. *Id.* at *10.

### A. Plaintiff Did Not Establish Proof of a Fiduciary Relationship

To establish that a debt is non-dischargeable due to fraud or defalcation while acting in a fiduciary capacity, the Plaintiff must establish, by a preponderance of the evidence, the existence

14

of an express trust or fiduciary relationship, and a debt caused by the debtor's fraud or defalcation while acting as a fiduciary. *Grogan v. Garner*, 498 U.S. at 291. Whether a debtor was acting in a fiduciary capacity for purposes of § 523(a)(4) is a question of federal law. *In re McGee*, 353 F.3d 537, 540 (7th Cir. 2003). Not all fiduciary relationships fall within the discharge exception. Seventh Circuit precedent has held that "section 523(a)(4) reaches only those fiduciary obligations in which there is substantial inequality in power or knowledge in favor of the debtor seeking the discharge and against the creditor resisting discharge, and does not reach 'a trust that has a purely nominal existence until the wrong is committed.'" *Matter of Woldman*, 92 F.3d 546, 547 (7th Cir. 1996) (quoting *In re Marchiando*, 13 F.3d 1111, 1116 (7th Cir.1994)).

In this case, Plaintiff has not established a substantial inequality in power between her and the Defendant. Plaintiff had sufficient knowledge and power to fairly negotiate the Lease Contract and understand the agreement she was entering into. Plaintiff had two weeks to review the Lease Contract before she signed it. She even had her attorney review the contract. Plaintiff has presented no evidence that Defendant was ever in a position of higher authority, professional status, or special confidence. In light of these factors, it cannot be said that Defendant had such knowledge or power over her so as to create a fiduciary relationship.

### B. Defendant Embezzled Plaintiff's Security Deposit

Embezzlement under § 523(a)(4) has been defined as the "fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *In re Weber*, 892 F.2d 534, 538 (7th Cir.1989) (quoting *Moore v. United States*, 160 U.S. 268, 269 (1895)). To prove embezzlement, Plaintiff must show that the Defendant appropriated the subject funds for his own benefit and did so with fraudulent intent or deceit.

*Weber*, 892 F.2d at 538. A fiduciary relationship or a trust relationship need not be established in order to find a debt nondischargeable by an act of embezzlement. *Id.*

The Court accepts Plaintiff's testimony that after she expressed her concerns about the size of the deposit and Defendant's financial condition, Defendant assured Plaintiff before they signed the lease that he would not spend any money Plaintiff deposited with him. While that oral statement itself was not a false statement that can trigger non-dischargeability for reasons earlier discussed, it can nevertheless be used as extrinsic evidence of how the parties interpreted the terms of the subsequent written contract. Plaintiff has shown that what Defendant accepted as a "security deposit" was intended by both parties to remain Plaintiff's property during the tenancy and that she entrusted that property to Defendant's safekeeping.

At trial, Defendant attempted to dispute this by testifying that there had been a prior version of the Lease Contract that specifically restricted Defendant from spending the Security Deposit. He claims that the restriction was removed in a later draft before the parties signed it. If that had indeed been the case, it might have tended to show that Plaintiff understood Defendant was planning to spend the deposit. However, Plaintiff denied there was a prior draft and Defendant did not provide a copy of the alleged prior version nor did he bring into court his attorney who allegedly drafted it. Due to the lack of any corroboration, his testimony is found not to have been credible. Defendant was also not credible in his testimony that Plaintiff had authorized him to spend the deposit, testimony also without corroboration.

Therefore, given that Defendant agreed not to spend the Security Deposit, the Lease Contract gave him nothing more than bare naked title enabling him to hold but not use the

deposit unless the property was damaged by Plaintiff.[6] Nevertheless, Defendant intentionally spent the money that he was entrusted to hold for Plaintiff, and in doing so, he committed embezzlement under 11 U.S.C. § 523(a)(4) after deceiving Plaintiff that the money would be kept safe.

Defendant claims that by spending that money to complete construction, he spent it for Plaintiff's benefit and not his own. It is unclear how Defendant spent the Security Deposit moneys because he failed to keep any records aside from bank statements showing electronic payments on personal his mortgage loan with CitiMortgage. He also withdrew tens of thousands of dollars in cash, which he claims to have paid to various contractors and landscapers to finish construction of the property. His account of those transactions, for which he has provided no records, receipts, check records, invoices, or contracts, and his claim of being unable to discover exactly to whom he assertedly paid all this cash, are at best disingenuous. The highly suspicious nature of these cash transactions suggests that much of the security deposit money was diverted to Defendant's use for personal expenses unrelated to the Property.

Furthermore, even if any amounts were actually used in completing construction, those amounts were nevertheless misappropriated by Defendant for his own benefit and were thereby embezzled. Title to the Narragansett Property was in Defendant's name as was the mortgage loan with CitiMortgage. Any expenditures of Plaintiff's money used to increase the value of Defendant's owned property, to pay Defendant's mortgage loan obligations, or to make repairs to

---

[6] Though "security deposits" often protect also against non-payment of rent, the Lease Contract was silent on that subject. Plaintiff stopped paying rent when Defendant told her that she should stop paying rent because he could no longer pay the mortgage. Defendant did not claim back rent as a justification for any of his use of the Security Deposit. Because the state court will be deciding damages, the effect, if any, of the foregoing history on those damages will be determined in that court, and will not be decided here.

satisfy Defendant's obligations under the Lease Contract all constituted embezzlement of Plaintiff's money. That such acts might have incidentally or potentially benefitted Plaintiff in some way should favorable events have occurred is not a defense to his deceit of Plaintiff in obtaining the Security Deposit.

Because Defendant agreed to hold the Security Deposit for Plaintiff's benefit, by intentionally spending that money to benefit his own interests, Defendant thereby committed embezzlement and therefore his obligation arising from failure to return Plaintiff's security deposit is not dischargeable in bankruptcy under 11 U.S.C. § 523(a)(4).

## CONCLUSION

Pursuant to the foregoing Findings of Fact and Conclusions of Law judgment will be awarded by separate order to Defendant Hesham K. Alomari against Plaintiff Erica Chriswell on Count I and to Plaintiff Erica Chriswell against Defendant Hesham K. Alomari on Count II in Plaintiff's Fourth Amended Complaint, whereby any judgment that Plaintiff may obtain against Mr. Alomari in the State Court Action will be nondischargeable.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Dated this 14th day of February 2013.